In re MIRAMAR RESOURCES, INC., Debtor (Employer's Tax I.D. 75–2243266).

MIRAMAR RESOURCES, INC., a Delaware Corporation, Plaintiff,

v.

Thomas B. WEBB, Defendant.

Bankruptcy No. 91–24033–DEC. Adv. No. 93–1803–MSK.

United States Bankruptcy Court, D. Colorado.

Dec. 22, 1994.

Peter J. Lucas, Doherty, Rumble & Butler, P.C., Denver, CO, for Miramar Resources, Inc.

David M. Rich, Clanahan, Tanner, Downing and Knowlton, P.C., Denver, CO, for Thomas B. Webb.

## MEMORANDUM AND ORDER

MARCIA S. KRIEGER, Bankruptcy Judge.

THIS MATTER came on before the Court for trial on Plaintiff's pre-petition legal malpractice claims.[1] Appearances were made by Peter J. Lucas of Doherty, Rumble & Butler, P.C., on behalf of Plaintiff Miramar Resources, Inc., and by David M. Rich of Clanahan, Tanner, Downing and Knowlton, P.C., on behalf of Defendant Thomas B. Webb.

The first issue in this matter is the scope of this Court's jurisdiction. The parties concede that the Bankruptcy Court has jurisdiction pursuant to 28 U.S.C. § 1334(b), but dispute whether this is a core or non-core proceeding. Plaintiff asserts that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(C) because it involves a counterclaim of the estate brought against a person who has filed a claim against the estate. The Defendant contends that the proceeding is non-core and refuses to consent to a final

determination by the Bankruptcy Court pursuant to 28 U.S.C. § 157(c)(2).

For the reasons stated below, I conclude that this proceeding is not a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(C). With this Order, I therefore submit my proposed Findings of Fact and Conclusions of Law pursuant to 28 U.S.C. § 157(c)(1) and Fed. R.Bankr.P. 9033.

## I. PERTINENT FACTS

This is an action brought by a reorganized Chapter 11 Debtor on a pre-petition legal malpractice claim. The parties agree that the pre-petition legal malpractice claims arise under and are to be determined in accordance with Oklahoma law. The Plaintiff (hereafter "Miramar") filed for bankruptcy protection under Chapter 11 on October 21, 1991. Miramar's First Amended Plan of Reorganization (the "Plan") was confirmed by Order of December 6, 1993. The Defendant (hereafter "Webb") is an Oklahoma attorney who represented Miramar in Oklahoma prior to its bankruptcy filing.

This adversary proceeding was initiated approximately 60 days before Miramar's Plan was confirmed. The Plan and the Disclosure Statement do not refer to this adversary proceeding, nor to any claim by Miramar against Webb. Miramar acknowledges that this proceeding was brought solely to increase the fund to be distributed to creditors under the Plan.

Webb filed a proof of interest asserting stock ownership in Miramar on October 19, 1992. Plaintiff Miramar does not contend that its claim in this action is a counterclaim to the proof of interest. Webb also filed a proof of claim for pre-petition legal fees incurred by the Debtor. This claim does not appear in the court records nor was a file-marked copy presented as evidence in this proceeding. The parties, however, have stipulated that such proof of claim was timely

---

1. The Amended Complaint stated claims based upon alleged wrongful acts of the Defendant during the bankruptcy case and for pre-petition legal malpractice. In the early stages of the proceeding, the Defendant sought mandatory or permissive abstention by the bankruptcy court pursuant to 28 U.S.C. § 1334(c). The request was denied. By the time of trial, the parties stipulated to dismissal of the claims pertaining to post-petition events, leaving only Plaintiff's claims for pre-petition professional malpractice.

filed. Miramar became aware of Webb's proof of claim in discovery on April 7, 1994. Miramar did not seek determination of Webb's proof of claim in this proceeding, nor had it done so in Miramar's bankruptcy case at any time prior to trial in this matter.

Miramar's Plan provides in paragraph 5.10 that all equity interests are canceled. According to paragraph 6.5(a), this occurs automatically on the Effective Date which was either 10 days after entry of the order confirming the Plan or the first business day after the pre-conditions to the effectiveness of the Plan were waived or satisfied.

Miramar's Plan provides in paragraph 9.4 that all pre-petition claims are extinguished and that in exchange for allowed claims, holders have specified rights under the Plan.

9.4. *Discharge of Claims.* Except as otherwise provided herein or in the Confirmation Order, the rights afforded in this Plan and the payments and distributions to be made hereunder shall be in complete exchange for, and in full satisfaction, discharge and release of, all existing debts and Claims of any kind, nature or description whatsoever against the Debtor or any of its assets or properties; and upon the Effective Date, all existing claims against the Debtor shall be, and be deemed to be, exchanged, satisfied, discharged and released in full; and all holders of claims shall be precluded from asserting against the Reorganized Miramar or its assets or properties any other or further Claim based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder filed a proof of claim.

The allowance of claims and interests is governed by the provisions of paragraph 6.7(a) and (b) of the Plan. In pertinent part:

(a) Any party in interest may initiate appropriate proceedings to object to any claim or Equity Interest. The commencement of a proceeding to object to a claim or Equity Interest shall be by filing the appropriate pleading with the Court pursuant to Rule 3013 of the Bankruptcy Rules of Procedure and giving notice to the Debtor. Any claim or interest for which a proof of claim or interest has been filed, or any scheduled claim or interest which is deemed filed under Section 1111(a) of the Code, not disputed within the applicable bar date set forth in subparagraph (b) below, shall be deemed allowed; except the Debtor may for cause, object to any claim after the bar date.

(b) An objection to a claim or interest may be commenced at any time prior to the following:

(1) For claims or interest timely filed prior to the Confirmation Date or claims or interests deemed filed under Section 1111(a) of the Code, objections must be filed and served not later than 90 days following the Confirmation Date.

(2) For claims or interest timely filed after the Confirmation Date, objections must be filed and served not later than 90 days after the claim is filed.

(3) For all other claims, objections must be filed and served not later than the entry of a final decree under Rule 3022 of the Rules.

## II. ISSUE PRESENTED

Is Miramar's claim based on pre-petition professional malpractice a "counterclaim by a bankruptcy estate against a person filing a claim against the estate," making this a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(C)?

## III. ANALYSIS

Prior to entering a final ruling in an adversary proceeding, the bankruptcy court must determine whether the proceeding is a core proceeding or a proceeding otherwise related to a case under Chapter 11. 28 U.S.C. § 157(3). If an adversary proceeding is determined to be core, the bankruptcy court may render a final order and judgment. If the proceeding is determined not to be core, although the bankruptcy court may hear the matter, the judge must submit proposed findings of fact and conclusions of law to the district court for entry of a final order or judgment, following a *de novo* review of any matters to which a party has timely and

specifically objected. 28 U.S.C. § 157(c)(1); Fed.R.Bankr.P. 9033.

Questions of subject matter jurisdiction are often thorny, especially those requiring application of the core/non-core distinctions created by 28 U.S.C. § 157 as part of Congress' jurisdictional overhaul of the bankruptcy court system in response to *Northern Pipeline Construction Company v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (hereinafter "*Marathon*"). Congress did not define the terms "core" or "non-core" in either Title 28 or in Title 11, however, in 28 U.S.C. § 157(b)(2) Congress delineated 15 non-exclusive examples of core proceedings. Among the listed examples is § 157(b)(2)(C), "counterclaims by the estate against persons filing claims against the estate." This section is the sole basis upon which Miramar claims that the proceeding before this Court is core.

█ In the Tenth Circuit, core proceedings are construed narrowly. Core proceedings have no existence outside of bankruptcy; actions which do not depend upon bankruptcy law for their existence and which can proceed in another court are not core proceedings. *Gardner v. U.S. (In re Gardner)*, 913 F.2d 1515, 1518 (10th Cir.1990); *First Nat'l. Bank of Westminster v. Rarick (In re Rarick)*, 132 B.R. 47, 51 (D.Colo.1991).

In this circuit, determination of whether a proceeding is core is a two-step process. First, the Court must apply the literal provisions of § 157(b)(2), then test its conclusion against the mandate of an analysis in *Marathon*. *In re Rarick*, 132 B.R. 47, 50–51 (D.Colo.1991); *In re Standard Metals Corp.*, 97 B.R. 593, 594 (Bankr.D.Colo.1988);

*Gstalder v. Seward (In re P & D Oilfield Equipment, Inc.)*, 71 B.R. 621, 623 (Bankr. D.Colo.1987); *Braucher v. Continental Ill. Nat'l Bank and Trust Co. of Chicago (In re Illinois–California Express, Inc.)*, 50 B.R. 232, 239 (Bankr.D.Colo.1985). Even if an action arguably fits within the literal wording of one of the 15 core proceedings listed in § 157(b)(2), it still must pass muster under *Marathon*. *Rarick*, 132 B.R. at 50–51.

**A.  *Section 157(b)(2)(C).***

Section 157(b)(2)(C) provides that "counterclaims by the estate against persons filing claims against the estate" are core proceedings. Neither the Tenth Circuit nor the District of Colorado has definitively interpreted § 157(b)(2)(C).[2] Although the language of 157(b)(2)(C) is not complicated, it is ambiguous because it mixes litigation and bankruptcy terminology.

The term **counterclaim** has meaning only in a litigation context; it is not defined in either Title 11 or Title 28. *Black's Law Dictionary* generally defines it as:

> a claim presented by a defendant in opposition to or deduction from the claim of the plaintiff. Fed.R.Civil P. 13. If established, such will defeat or diminish the plaintiff's claim. Under federal rule practice, and also in most states, counterclaims are either compulsory (required to be made) or permissive (made at option of defendant).

*Black's Law Dictionary*, 315 (5th ed. 1979). A term of art, a **counterclaim** arises in the context of a lawsuit in which opposing parties seek a final determination as to a given subject matter. It is not surprising, therefore, that in the bankruptcy arena, the only refer-

---

**2.** The only reported case in this district which discusses § 157(b)(2)(C) is *Kaiser Steel Corp. v. Frates (In re Kaiser Steel Corp.)*, 95 B.R. 782 (Bankr.D.Colo.1989) (affirmed on other grounds), 109 B.R. 968 (D.Colo.1989) (appeal dismissed and remanded on other grounds), 911 F.2d 380 (10th Cir.1990). In *Kaiser*, Chief Judge Matheson of this court presided over a multiparty adversary proceeding initiated by a Chapter 11 debtor-in-possession. Some creditor defendants filed proofs of claim in the bankruptcy case; some did not. Some raised counterclaims against the debtor-in-possession in the proceeding.

In determining the parties' rights to a jury trial, Judge Matheson concluded "that Congress intended core matters concerning the debtor's estate and adjustment of the debtor creditor relationships to be determined in summary proceedings" and that there was no right to a jury trial in core proceedings. He reasoned that a creditor consents to the equitable jurisdiction of the bankruptcy court when the creditor files *either* a proof of claim *or* a counterclaim to a claim brought by the estate; once the consent is given, the entire proceeding should be treated as a core proceeding. *Kaiser*, 95 B.R. at 788.

ence made to a counterclaim is found in Part VII of the Federal Rules of Bankruptcy Procedure, which are applicable to adversary proceedings and, in part, to contested matters. Fed.R.Bankr.P. 7013 (with exceptions not relevant here) incorporates Federal Rule of Civil Procedure 13, which, except by express court order, is applicable only in adversary proceedings. Fed.R.Bankr.P. 9014. Under Fed.R.Civ.P. 13, there is no generic counterclaim; a counterclaim is either compulsory because it arises out of the same subject matter as the original claim(s) in the lawsuit, or it is permissive.

In contrast, the phrase **persons filing claims** has a distinctive bankruptcy meaning. The filing of a proof of claim initiates the claim allowance process which is at the heart of the re-adjustment of debtor-creditor relationships in bankruptcy. *Granfinanciera S.A. v. Nordberg*, 492 U.S. 33, 58, 109 S.Ct. 2782, 2799, 106 L.Ed.2d 26 (1989); *Katchen v. Landy*, 382 U.S. 323, 329, 86 S.Ct. 467, 472, 15 L.Ed.2d 391 (1966). A **person** is defined in 11 U.S.C. § 101(41). A **claim** is defined in 11 U.S.C. § 101(5). Filing of proofs of claim is governed by 11 U.S.C. § 501 and Fed.R.Bankr.P. 3001 through 3005. Allowance or disallowance of claims is governed by 11 U.S.C. § 502 and Fed. R.Bankr.P. 3006 through 3009.

Rule 7013 intersects with the claim allowance process only in adversary proceedings where there is an objection to a claim. Fed. R.Bankr.P. 3007 and 9014. A simple objection to a claim is a contested matter, but if an objection to a claim is joined with a demand for relief of the kind specified in Rule 7001, the matter becomes an adversary proceeding, which may include affirmative defenses and counterclaims. Often, ancillary matters are joined in the adversary proceeding so that the allowance of the claim and complete restructuring of debtor-creditor rights may be determined with finality in one forum.

In my mind, the combination of "counterclaim" with "persons filing claims" makes § 157(b)(2)(C) either facially ambiguous or specifically limited to a narrow slice of the bankruptcy process—adversary proceedings involving objections to claims.[3] Did Congress intend that after a proof of claim is filed, any claim by the estate against the Creditor is a core proceeding? Or, did Con-

---

3. Some courts have restricted 28 U.S.C. § 157(b)(2)(C) to proceedings where the creditor's claim is determined. *See Germain v. Connecticut National Bank*, 988 F.2d 1323 (2d Cir. 1993). Others, guided by their interpretation of *Marathon* and subsequent cases, conclude that § 157(b)(2)(C) must generously cover all proceedings involving any claim by a bankruptcy estate against a creditor who has ever filed a proof of claim or counterclaim regardless of whether the creditor's claim will be allowed or disallowed in the subject proceeding. *See, supra,* note 2.

One commentator argues that § 157(b)(2)(C) was drafted to avoid the *Katchen v. Landy* problem which developed under the Bankruptcy Act. Thomas S. Marion, *Core Proceedings and "New" Bankruptcy Jurisdiction*, 35 DePaul L.Rev. 675 (1986). Marion argues that the provisions of § 157(b)(2)(C) were inserted by Congress to implement § 502(d), using the core characterization to parallel the summary jurisdiction under § 57(g) of the Bankruptcy Act. Under the Act, § 57(g) made certain claims of the estate offsets against creditors' claims. Determination of the creditor's claim and the offsets were the subject of summary jurisdiction, while determination of the same estate claims raised not in response to a creditor's claim were subject to plenary jurisdiction. This treatment was embodied in § 502(d) of the Code.

Marion further contends that the Supreme Court focused upon § 57(g) of the Act, which provided that allowance of a creditor's claim was forbidden if the creditor "received or acquired preferences, liens, conveyances, transfers, assignments, encumbrances, void or voidable under this title" in *Katchen v. Landy*, 382 U.S. 323, 329, 86 S.Ct. 467, 472, 15 L.Ed.2d 391 (1966). In *Katchen*, the Court concluded that the right of offset of claims by the estate against proofs of claim was an integral part of the equitable process of allowance and disallowance of claims.

Unavoidably and by the very terms of the Act, when a bankruptcy trustee presents a § 57, sub. g objection to a claim, the claim can neither be allowed nor disallowed until the preference matter is adjudicated. The objection under § 57, sub. g is, like other objections, part and parcel of the allowance process and is subject to summary adjudication by the bankruptcy court.

382 U.S. at 330, 86 S.Ct. at 473. Marion contends that in *Katchen* the Court distinguished the offset rights arising in § 57(g) from Trustee claims against creditors arising under § 60 outside the claim allowance process reasoning that the bankruptcy court's jurisdiction over preference claims under § 60 was concurrent with state courts and involved a plenary determination in which a defendant was entitled to a jury trial.

gress intend § 157(b)(2)(C) to apply only to adversary proceedings involving an objection to a creditor's claim. To unravel Congress' intent, one must look to the structure of § 157 and to legislative history.

■ The structure of § 157 suggests that Congress intended § 157(b)(2)(C) to be narrowly applied to adversary proceedings in which an objection to a creditor's claim is an issue. With rare exception, all of the subsections of § 157(b)(2) pertain to matters raised in the administrative portion of a bankruptcy case or which specifically arise under bankruptcy law. These include allowance/disallowance of claims, obtaining credit, turn over of property of the estate, avoidance of preferences, matters pertaining to the automatic stay, determination of the nature and priority of liens, and confirmation of plans. Subsection (b)(2)(B), which directly precedes § 157(b)(2)(C), pertains to allowance, disallowance, or estimation of claims against the estate. Because objections to claims may be countered with claims raised by the estate, it is logical to treat both objections to claims (§ 157(b)(2)(B)) and counterclaims (§ 157(b)(2)(C)) as core matters. Presumably, had Congress intended to define proceedings to determine all claims raised by the estate against a creditor which had filed a proof of claim as core, it would have said so plainly. In such event, there would have been no need to use the term "counterclaim" at all.

Regrettably, the legislative history preceding the adoption of § 157(b)(2)(C) is not particularly helpful. Section 157(b)(2)(C) was adopted as only one subsection of § 157,

which was only one part of Congress' jurisdictional overhaul. The legislative history reflects debates concerning the scope of jurisdiction of bankruptcy courts with regard to proceedings initiated by the estate and claims arising under state law, rather than specifically expressing intent behind § 157(b)(2)(C).[4] However, I have been unable to find any specific legislative reference to Congress' intent in enacting § 157(b)(2)(C) independent from the other provisions of Section 157.[5]

According to the literal language of § 157(b)(2)(C), this cannot be a core proceeding because it does not involve a determination of Webb's proof of interest, proof of claim or any objection to either.

## B.  Marathon and its progeny.

The second step in determining whether a proceeding is core is to test the conclusion reached in applying § 157(b) against the constitutional mandate of Marathon. This second analytical step is especially important in interpreting § 157(b)(2)(C) because Marathon and two subsequent Supreme Court opinions specifically address the jurisdiction of bankruptcy courts to adjudicate claims brought by the bankruptcy estate against a creditor. Indeed, based upon Granfinanciera S.A. v. Nordberg, 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989) and Langenkamp v. Culp, 498 U.S. 42, 111 S.Ct. 330, 112 L.Ed.2d 343 (1990), some courts apply § 157(b)(2)(C) anytime a creditor has filed a proof of claim regardless of whether the estate's claim and the creditor's claim are the subject of the same adversary proceeding.

4.  The Senate version of 28 U.S.C. § 1334, unlike the House version which ultimately passed, would have "prohibited the bankruptcy courts or district courts from considering any case that was based upon a state law claim." 130 Cong. Rec. S8890 (1984) (Statement of Senator Dole). "The Senate, by passing S. 1013 on April 27, 1983, and the House passing the Kastenmeier-Kindness amendment to H.R. 5174 on March 21, 1984, made policy decisions to limit bankruptcy courts to article I status and thereby limit the jurisdiction of the bankruptcy court to make it consistent with Marathon. However, without providing for abstention by the court, we are denying an individual the right to have a State-created right adjudicated by a State court and expanding jurisdiction of the bankruptcy court

inconsistent with the Marathon decision." 130 Cong.Rec. S7619 (1984) (Statement of Sen. Heflin).

5.  See Bankruptcy Court Act of 1983: Hearing on H.R. 3 Before the Subcomm. on Monopolies and Commercial Law of the House Judiciary Committee, 98th Cong., 1st Sess. (1983); Bankruptcy Reform: Hearing before the Subcomm. on Court of the Committee on the Judiciary, 98th Cong., 1st Sess. (1983); H.R.Rep. No. 9, 98th Cong., 1st Sess. (1983); S.Rep. No. 55, 98th Cong., 1st Sess. (1983); S.Rep. No. 65, 98th Cong., 1st Sess.1983; 129 Cong.Rec. D552 (1983); 129 Cong.Rec. S5433 (1983); 130 Cong.Rec. H1341 (1984); 130 Cong.Rec. S6107 (1984).

In *Marathon*, the Supreme Court was presented with litigation brought by a bankruptcy estate to determine pre-petition contract and misrepresentation claims. A plurality of the Court concluded that because bankruptcy courts were created under Article I of the Constitution they lacked jurisdiction to adjudicate matters involving claims based upon private rights. The Court distinguished private rights, i.e., those rights created by state or common law, from public rights such as those created by the Bankruptcy Code.

> [T]he restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state created private rights, such as the right to recover contract damages that is at issue in this case. The former may well be a "public right," but the latter obviously is not. Appellant Northern's right to recover contract damages to augment its estate is "one of a private right, that is, of the liability of one individual to another under the law as defined."

*Marathon*, 458 U.S. at 471–72, 102 S.Ct. at 2871–72, citing to *Crowell v. Benson*, 285 U.S. 22, 51, 52 S.Ct. 285, 292, 76 L.Ed. 598 (1932). In *Marathon*, the Court holds that if the claim is based upon state law and would exist outside of the bankruptcy case, it is a private right which must be finally determined by an Article III court. Conversely, if the right or claim arises under bankruptcy law created by Congress through statute, it can be adjudicated by a statutorily created court. *Marathon* tests bankruptcy court jurisdiction by the nature or status of the claim to be adjudicated.

In response to *Marathon*, Congress implemented the core/non-core distinction embodied in 28 U.S.C. § 157. The Supreme Court has yet to consider the constitutionality of the core/non-core scheme, but it has hinted at its vision of bankruptcy court jurisdiction in *Granfinanciera* and *Langenkamp*. Technically, both opinions concern a creditor's right to a jury trial on claims brought by a bankruptcy estate, but the *dicta* in *Granfinanciera*, when read with the holding in *Langenkamp*, has created much speculation as to whether the status test of *Marathon* is still applicable when a creditor has filed a proof of claim.

In *Granfinanciera*, the Supreme Court held that a creditor who had not filed a proof of claim against the bankruptcy estate had a constitutional right to a jury trial on a trustee's fraudulent transfer claim. In *Langenkamp*, the Supreme Court held that creditors who had filed proofs of claim brought themselves within the equitable jurisdiction of the bankruptcy court and thereby waived their constitutional right to a jury trial on preferential transfer claims brought by the bankruptcy estate.

*Granfinanciera* and *Langenkamp* suggest a subtle, but substantial, shift from the simple status test used in *Marathon*. In *Granfinanciera*, the Court iterates the public versus private right distinction, but modifies the status test for determining a private or public right by adding a functional element. The Court reasons that whether a claim arises from a public or private right is not determined by its original status, but instead by whether the claim or right asserted is so integral to the public regulatory scheme as to be appropriate for resolution with only limited involvement of an Article III court.

> The crucial question, in cases not involving the Federal Government, is whether "Congress, acting for a valid legislative purpose pursuant to its constitutional powers under Article I, [has] create[d] a seemingly 'private' right that is so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution with limited involvement by Article III judiciary." (citation deleted) If a statutory right is not closely intertwined with the federal regulatory program, Congress has the power to enact, and if that right neither belongs nor exists against the Federal Government, then it must be adjudicated by an Article III court. If the right is legal in nature, then it carries with it the Seventh Amendment guarantee of a jury trial.

*Granfinanciera*, 492 U.S. at 54, 109 S.Ct. at 2797.

Using this functional approach, the Court then reasons that a fraudulent conveyance claim brought by a bankruptcy trustee is a

private rather than a public right because it is *not* "an integral part of the bankruptcy case", but is simply a claim arising during the case. *Granfinanciera,* 492 U.S. at 56, 109 S.Ct. at 2798. Fraudulent conveyance claims are quintessentially suits at common law and "[l]egal claims are not magically converted into equitable issues by their presentation to a court of equity." *Granfinanciera,* 492 U.S. at 52, 109 S.Ct. at 2795 (citing *Ross v. Bernhard,* 396 U.S. 531, 538, 90 S.Ct. 733, 738, 24 L.Ed.2d 729 (1970)).

The Court bolsters this functional approach by referring to its analysis in *Katchen v. Landy,* 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966). The Court's reference to *Katchen* has great significance. *Katchen* interpreted the Bankruptcy Act under which bankruptcy referees had authority to fully adjudicate certain claims (summary jurisdiction) and limited authority as to other claims (plenary jurisdiction). In *Katchen,* the issue was the jurisdiction of the bankruptcy court over claims brought by the estate as part of the claims allowance process under § 57(g) of the Act. The Court concluded, based on the specific language of § 57(g) that the referee had summary jurisdiction over both the creditor's claim and the estate's claim.[6] The Supreme Court's reference to *Katchen* in *Granfinanciera* reinforces its conclusion that the jurisdiction of the bankruptcy court to adjudicate claims depends not on the status of the claim, but instead upon the relationship of the claim to the bankruptcy process, particularly the claims allowance process.

Often *Katchen* is cited for the principle that by filing proofs of claim, creditors consent to bankruptcy court jurisdiction. The Court's endorsement of *Katchen* suggests that under the Bankruptcy Code a creditor consents to or triggers the bankruptcy court's jurisdiction over claims brought by the estate by filing a proof of claim. If *Katchen,* as applied in *Granfinanciera,* is read as giving a bankruptcy court core jurisdiction to fully adjudicate all estate claims against a creditor who has filed a claim, both

the status test of *Marathon* and the reference to a "counterclaim" by the estate in § 157(b)(2)(C) become meaningless. If however, *Katchen,* interpreted through *Granfinanciera,* means that a bankruptcy court has the authority to fully adjudicate only estate claims raised as offsets to creditors' claims under 11 U.S.C. § 502(d) or where the estate's and creditors' claims are procedurally and substantively joined in a single proceeding, both the status test of *Marathon* and the reference to a "counterclaim" by the estate retain meaning.

The *dicta* in *Granfinanciera* also perpetuates confusion between the subject matter jurisdiction of a bankruptcy court under the Bankruptcy Code and a creditor's constitutional right to a jury trial. The Supreme Court observes that the constitutional limitation on the jurisdiction of the bankruptcy court as an Article I court also precludes it from conducting jury trials.

> Our case law makes plain, however, that the class of "public rights" whose adjudication Congress may assign to administrative agencies or courts of equity sitting without juries is more expansive than *Atlas Roofing's* discussion suggests. Indeed, our decisions point to the conclusion that, if a statutory cause of action is legal in nature, the question whether the Seventh Amendment permits Congress to assign its adjudication to a tribunal that does not employ juries as factfinders requires the same answer as the question whether Article III allows Congress to assign adjudication of that cause of action to a non-Article III tribunal. For if a statutory cause of action, such as respondent's right to recover a fraudulent conveyance under 11 U.S.C. § 548(a)(2), is not a "public right" for Article III purposes, then Congress may not assign its adjudication to a specialized non-Article III court lacking "the essential attributes of the judicial power."

*Granfinanciera, S.A. v. Nordberg,* 492 U.S. at 53, 109 S.Ct. at 2796. Based on this

---

6. Many who feared that *Marathon* invalidated broad jurisdiction of bankruptcy courts created when the Bankruptcy Code was enacted were relieved by the Court's reliance on *Katchen v. Landy* in *Granfinanciera.* The reference to

*Katchen* at least reaffirmed the core jurisdiction in claims proceedings. However, it has left many confused as to whether the core/non-core distinctions are just new labels for the summary/plenary jurisdiction concepts.

analysis, all Circuits, but the Second, agree that a matter requiring a jury trial must be tried by an Article III court.

The holding in *Langenkamp* further links issues of subject matter jurisdiction with issues of a creditor's right to a jury trial. In *Langenkamp*, the Court holds that the filing of a proof of claim constitutes a waiver of a creditor's right to jury trial, not only on its claim, but also on preference claims brought by the estate. Borrowing from its *Katchen* analysis, the Court reasons that the filing of a proof of claim triggers the claim allowance process which is an equitable process in which no jury trial can be held. By coincidence, the claims allowance process is also the process over which the bankruptcy court has complete adjudicatory power.

The *dicta* of *Granfinanciera* and the holding of *Langenkamp* can be interpreted together to create a practical, but mechanical test which replaces both *Marathon*'s status test and the concept of a "counterclaim" as used in § 157(b)(2)(C). If a proof of claim has been filed by a creditor, all claims by the estate against the creditor become core matters regardless of whether the creditor's and estate's claims are offsets or the subject of the same adversary proceeding.

Since *Granfinanciera* and *Langenkamp*, there have been widely disparate rulings as to whether bankruptcy courts have core jurisdiction over claims brought by estates against creditors who have filed proofs of claim. However, where no clearly identifiable basis for core jurisdiction can be found, courts appear to follow one of three philosophical approaches.

Courts who view the precedential effect of *Granfinanciera* and *Langenkamp* as being limited to jury trial issues, continue to employ the *Marathon* status test for resolution of core or non-core status with regard to claims brought by the estate. These Courts continue to interpret core status narrowly based upon the status of a claim as a private right or a public right. *See,* e.g., *Gardner v. U.S. (In re Gardner),* 913 F.2d 1515 (10th Cir.1990); *Diamond Mortgage Corp. of Ill. v. Sugar,* 913 F.2d 1233 (7th Cir.1990); *Waire v. Baker,* 145 B.R. 267 (N.D.Ind.1992);

*Rheem Manufacturing Co. v. Cheatham,* 132 B.R. 323 (E.D.La.1991).

Those who view the opinions in *Granfinanciera* and *Langenkamp* as modifying or rejecting the *Marathon* status test, employ the functional approach. Some apply it narrowly, some broadly. The scope of core matters under the functional approach depends upon the definition of the claim allowance process.

Narrowly applied, the functional approach limits the claim allowance process to objections to claims in adversary proceedings where the creditor's claim and a claim by the estate are procedurally and substantively linked. Illustrative of this approach is the decision of the Second Circuit Court of Appeals in *Germain v. Connecticut Nat'l Bank,* 988 F.2d 1323 (2d Cir.1993). In *Germain,* a Chapter 7 trustee asserted a lender liability claim against a bank which had filed a proof of claim in the bankruptcy case. The trustee requested a jury trial. The bank argued that the trustee did not have a constitutional right to a jury trial because the claim arose post-petition and implicated provisions of the Bankruptcy Code. The Second Circuit followed *Katchen* and *Langenkamp* by reasoning that the filing of a proof of claim triggered the bankruptcy claim allowance process, but carefully restricted the claim allowance process to those proceedings in which the creditor's claim was determined. It reasoned that in both *Katchen* and *Langenkamp,* the estate's preference and fraudulent conveyance claims were substantively and procedurally tied to the determination of the creditor's claim as offsets. In contrast, the trustee's lender liability claim was unrelated to the creditor's proof of claim, both procedurally and substantively. Determination of the lender liability claim was not part of the claims allowance process, and therefore, the Trustee had a right to a jury trial. *Germain,* 988 F.2d at 1327. *See also Treadway v. United Bank & Trust Co. (In re Treadway),* 117 B.R. 76 (Bankr.D.Vt.1990).

Broad application of the functional approach treats the entire bankruptcy case as the claim allowance process. From this perspective, once a creditor has filed a proof of claim or otherwise initiated the claim allowance process, determination of any claim

brought by the estate against the creditor is a core proceeding. There is no need for a substantive or procedural linkage between the proof of claim and the estate's claim, and the estate's claim need not be an offset or defense to the creditor's claim. *See*, e.g., *N.I.S. Corp. v. Hallahan (In re Hallahan)*, 936 F.2d 1496 (7th Cir.1991); *Honigman, Miller, Schwartz & Cohn v. Weitzman (In re Delorean Motor Co.)*, 155 B.R. 521 (9th Cir. BAP 1993); *Woodard v. Sanders (In re SPI Communications & Marketing, Inc.)*, 114 B.R. 14 (N.D.N.Y.1990); *In re New York City Shoes, Inc.*, 122 B.R. 668 (E.D.Pa.1991); *Pan Am. World Airways Inc. v. Evergreen Int'l Airlines, Inc.*, 132 B.R. 4 (S.D.N.Y. 1991); *Kaiser Steel Corp. v. Frates (In re Kaiser Steel Corp.)*, 95 B.R. 782 (Bankr. D.Colo.1989).

■ For purposes of this proceeding, it is unnecessary to choose between the *Marathon* status test and the functional approach of *Granfinanciera* and *Langenkamp*. Under either analysis, I conclude this proceeding is non-core.

Under the *Marathon* status test, this proceeding cannot be core because Miramar's pre-petition legal malpractice claim arose under Oklahoma law prior to the bankruptcy case. It arose from a private right with independent existence outside Miramar's bankruptcy case.

Similarly, Miramar's claim cannot be considered core under either a narrow or broad application of the functional approach. The essence of the functional view is that the estate's claim be related to the claim allowance process. Regardless of whether the claim allowance process is defined narrowly or broadly, it has a beginning and an ending point. The triggering of the claim allowance process is the filing of the proof of claim. The conclusion of the claim allowance process is the completion of the restructuring of the debtor-creditor relationship by allowance or disallowance of the claim. *See In re New York City, Inc.*, 122 B.R. 668 (E.D.Pa.1990) (where the court ruled that a debtor's complaint filed more than one year after waiver and disallowance of creditor's proofs of claim constituted the initiation of a new suit, not a counterclaim). In a Chapter 11 case, this occurs in accordance with the terms of a confirmed reorganization plan. *Paul v. Monts*, 906 F.2d 1468, 1471 (10th Cir.1990); *Howe v. Vaughan (In re Howe)*, 913 F.2d 1138, 1144 (5th Cir.1990); *J.T. Moran Financial Corp. v. American Consolidated Financial Corporation (In re J.T. Moran Financial Corp.)*, 124 B.R. 931, 940 (S.D.N.Y. 1991).

The Miramar claims allowance process was concluded as to Webb by virtue of the confirmation of Miramar's Plan. Webb's proof of interest was canceled. The time for objecting to Webb's timely filed proof of claim had expired without objection. Miramar made no attempt to raise any objection, untimely though it may have been, to Webb's claim or to have his claim disallowed in this proceeding or in its main case. Thus, according to the terms of Miramar's confirmed Plan, Webb's claim was extinguished and substituted with contractual rights. *Paul v. Monts*, 906 F.2d 1468, 1471 (10th Cir.1990). Because the claims process had been concluded as to Webb, Miramar's claim in this proceeding constitutes an independent lawsuit, not a counterclaim.

Accordingly, whether the language of 28 U.S.C. § 157(b)(2)(C) is applied literally, or interpreted in light of *Marathon, Granfinanciera* or *Langenkamp*, I conclude that this is not a core proceeding. **SO ORDERED.**